**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

GILBERTO AVILA,

              Plaintiff,

        v.

NANCY A. BERRYHILL, Acting
Commissioner of Social
Security,

              Defendant.

Case No. EDCV 17-1440-JPR

**MEMORANDUM DECISION AND ORDER
AFFIRMING COMMISSIONER**

## I.    PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security supplemental security income benefits ("SSI"). The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed February 28, 2018, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is affirmed.

## II. BACKGROUND

Plaintiff was born in 1966. (Administrative Record ("AR") 31, 239, 241.) He received a GED (AR 58, 265) and worked as a hairdresser, waiter, and community outreach worker (AR 265, 284, 370).

On January 10, 2013, Plaintiff applied for SSI, alleging that he had been unable to work since June 1, 1996,[1] because of stroke, heart problems, learning disability, posttraumatic stress disorder, and mental illness. (AR 21, 241-49, 264.) After his application was denied initially and on reconsideration (see AR 101-03, 119-20), he requested a hearing before an Administrative Law Judge (AR 137). Hearings were held on June 5 and December 16, 2015.[2] (AR 39-82.) Plaintiff, who was represented by counsel, testified (AR 41-43, 51-58, 71-78, 886-95), as did a medical expert (AR 43-50, 875-86) and a vocational expert (AR 58-63, 895-900).[3] In a written decision issued January 13, 2016,

---

[1]    Plaintiff listed June 1, 1996, as his disability-onset date (AR 241), but the actual date of his stroke is unclear (see AR 46 (medical-expert testimony that "I don't think we know exactly when [the stroke] happened")). The record gives estimated dates between 1995 and 1998. (See AR 71 (Plaintiff's attorney giving date as "1996 or '98" and remarking, "[i]t's sort of unclear"), 369 (Plaintiff "has been having difficulty since 1995"), 420 (consulting examiner reporting date as "1998" with possible second stroke in 2005).) Contemporaneous medical documentation is not in the AR.

[2]    The parties erroneously give the hearing dates as June 5 and December 16, 2016, which would have been after the ALJ's decision was issued. (See J. Stip. at 2.)

[3]    AR 48 is labeled as page 10 of the December 16, 2015 hearing transcript, AR 49 is labeled as page 16, AR 50 as page 17, and AR 51 as page 20. (See AR 48-51.) On September 20, 2018, in response to this Court's order, the parties supplemented the AR by lodging the full transcript of the December 16, 2015 hearing. (See AR 871-903.) They agreed that no supplemental

2

the ALJ found Plaintiff not disabled. (AR 18-38.) Plaintiff

sought Appeals Council review (AR 238, 336-37), which was denied

on May 19, 2017 (AR 4-9). This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the

Commissioner's decision to deny benefits. The ALJ's findings and

decision should be upheld if they are free of legal error and

supported by substantial evidence based on the record as a whole.

See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v.

Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence

means such evidence as a reasonable person might accept as

adequate to support a conclusion. Richardson, 402 U.S. at 401;

Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It

is more than a scintilla but less than a preponderance.

Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.

Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether

substantial evidence supports a finding, the reviewing court

"must review the administrative record as a whole, weighing both

the evidence that supports and the evidence that detracts from

the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715,

720 (9th Cir. 1998). "If the evidence can reasonably support

either affirming or reversing," the reviewing court "may not

substitute its judgment" for the Commissioner's. Id. at 720-21.

Courts "may not reverse an ALJ's decision on account of an error

that is harmless," that is, "inconsequential to the ultimate

briefing was required because they had not relied on any
previously missing pages of the transcript in making their
arguments. (See J. Rep. at 2.) The AR thus now appears to be
complete.

nondisability determination." <u>Molina v. Astrue</u>, 674 F.3d 1104,
1111, 1115 (9th Cir. 2012) (citation omitted).

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or has lasted, or is expected to
last, for a continuous period of at least 12 months.  42 U.S.C.
§ 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir.
1992).

A.  <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step evaluation process to assess
whether a claimant is disabled.  20 C.F.R. § 416.920(a)(4);
<u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as
amended Apr. 9, 1996).  In the first step, the Commissioner must
determine whether the claimant is currently engaged in
substantial gainful activity; if so, the claimant is not disabled
and the claim must be denied.  § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful
activity, the second step requires the Commissioner to determine
whether the claimant has a "severe" impairment or combination of
impairments significantly limiting his ability to do basic work
activities; if not, the claimant is not disabled and his claim
must be denied.  § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of
impairments, the third step requires the Commissioner to
determine whether the impairment or combination of impairments
meets or equals an impairment in the Listing of Impairments set

forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[4] to perform his past work; if so, he is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 416.920(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 416.920(a)(4)(v); Lester, 81 F.3d at 828 n.5.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 10, 2013, the application date. (AR 23.) At step two, he concluded that Plaintiff had the severe impairments of "cerebellar infarct with

---

[4]   RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

residual hemiataxia."[5]  (Id.)  He found Plaintiff's impairments
of "glaucoma" and "depressive disorder and anxiety disorder" not
severe.  (Id.)  At step three, he determined that Plaintiff's
impairments did not meet or equal a listing.  (AR 24.)  At step
four, the ALJ found that Plaintiff's "statements concerning the
intensity, persistence[,] and limiting effects of [his] symptoms
[were] not entirely credible" (AR 25) and concluded that he had
the RFC to perform "a full range of work at all exertional
levels" subject to the following exceptions:

> [N]o limitation lifting and/or carrying; no limitation
> standing and/or walking; does not require a cane in order
> to stand or ambulate; frequently bend, stoop, kneel,
> crouch, and crawl; occasionally climb and balance; and
> never climb ladders, ropes, or scaffolds, or work at
> unprotected heights due to residual hemiataxia.

(AR 24.)  Plaintiff did not have past relevant work.  (AR 31.)
At step five, the ALJ found that given Plaintiff's age,
education, work experience, and RFC, there were jobs he could
perform existing in significant numbers in the national economy.
(Id.)  Thus, the ALJ found Plaintiff not disabled.  (AR 32.)

---

[5]  Hemiataxia is a loss of muscle control affecting one
side of the body and may result from stroke or cerebellar injury.
See Hemiataxia, The Free Dictionary-Medical Dictionary,
https://medical-dictionary.thefreedictionary.com/hemiataxia (last
visited Sept. 28, 2018).

1    **V.    DISCUSSION[6]**

2          Remand Is Not Warranted Based on the ALJ's Step-Two

3          Determination Concerning Plaintiff's Mental Impairments

4          Plaintiff argues that the ALJ improperly ignored the

5    moderate limitations assessed by psychologists Margaret Donohue

6    and Robin Rhodes Campbell, whose opinions the ALJ afforded "great

7    weight" in other respects, and as a result erroneously determined

8    his mental impairments to be nonsevere at step two. (See J.

9    Stip. at 5-13, 19-20.) As discussed below, the ALJ did not

10   ignore the opinions of Drs. Donohue and Campbell, and even if he

11   did err in failing to adequately explain his reasons for

12   rejecting the limitations they opined, any such error was

13   harmless. Remand is therefore unwarranted.

14          1.   Applicable law

15       The step-two inquiry is "a de minimis screening device to

16   dispose of groundless claims" when a claimant's impairments are

17   not severe. Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir.

18   1996). "An impairment or combination of impairments may be found

19   'not severe only if the evidence establishes a slight abnormality

20   that has no more than a minimal effect on an individual's ability

21   to work.'" Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005)

22   (quoting Smolen, 80 F.3d at 1290 (emphasis in original)). A

23   _____

24          [6] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the
     Supreme Court recently held that ALJs of the Securities and
25   Exchange Commission are "Officers of the United States" and thus
     subject to the Appointments Clause. To the extent Lucia applies
26   to Social Security ALJs, Plaintiff has forfeited the issue by
     failing to raise it during his administrative proceedings. (See
27   AR 4-9, 39-82, 238, 336-37; J. Stip. at 5-13, 19-20); Meanel v.
     Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended)
28   (plaintiff forfeits issues not raised before ALJ or Appeals
     Council).

court must determine whether substantial evidence in the record supported the ALJ's finding that a particular impairment was not severe. Id. at 687.

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see also Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008). An ALJ may accept some portions of a medical source's opinion and reject others. See Magallanes, 881 F.2d at 754 (ALJ properly accepted doctor's objective findings but rejected his opinion as to disability onset date); see also Stewart v. Colvin, No. 1:13-cv-00187-BAM., 2014 WL 3615237, at *6 (E.D. Cal. July 21, 2014) (expressly rejecting plaintiff's contention that ALJ "cannot 'pick and choose' among portions of medical opinions"). When the relevant opinion or portion of it is contradicted by other evidence in the record, the ALJ need provide only a "specific and legitimate" reason supported by "substantial evidence" in order to reject it. See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (citation omitted). An ALJ need not recite "magic words" to reject a physician's opinion or a portion of it; the court may draw "specific and legitimate inferences" from the ALJ's opinion. Magallanes, 881 F.2d at 755.

The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

## 2. Relevant background

### a. *Plaintiff's neurological condition*

Plaintiff had a stroke in or around 1996[7] and an aortic-valve replacement. (See AR 379, 382.) He reported that the stroke left him with left-side weakness, dizziness, balance problems, vision loss in his right eye, and mental-health difficulties. (See, e.g., AR 369, 382, 389.) Later CT scans confirmed changes in Plaintiff's brain from "old infarcts." (See AR 368 (reporting 2008 scan showing "low-density changes of the left cerebral hemisphere and right cerebrum with atrophy representing old infarcts" and "old left frontal lobe infarct" but no acute damage), 389 (2013 scan showing "[c]hronic postinfarction encephalomalacia involving the cerebellar hemispheres bilaterally" but "[n]o acute abnormality").)

On June 6, 2013, Plaintiff saw internal-medicine specialist Dr. Ruben Ustaris for a consulting exam. (AR 379-83.) He complained of "constant dizziness," "falling," "loss of memory function," difficulty "understanding what he reads or hears," and "severe depression." (AR 379.) Dr. Ustaris noted that Plaintiff walked with a "long wooden rod" but was capable of walking without it, although he tended to "grab the wall after he step[ped] to maintain balance." (AR 380.) He observed that Plaintiff's "left extremities are slightly weaker compared to the right" but graded both at "5/5 in terms of motor strength." (AR 381.) He opined that Plaintiff needed "a cane for balance only to prevent falls" while walking, could "bend, stoop, kneel and

---

[7] The exact date of Plaintiff's stroke is unclear. See supra note 1.

9

crawl frequently but climb and balance occasionally," and could not "work at unprotected heights because of history of dizziness and problems with equilibrium." (AR 382.) He did not assess any other restrictions. (Id.)

On August 5, 2013, Plaintiff met with neurologist Robert Moore for a consulting exam. (AR 420-24.) He arrived on time and "was able to drive himself to the office." (AR 420.) He told Dr. Moore that "in 1998, while living in Mexico," he "suffered what sounds like an embolic infarction related to bacterial endocarditis." (Id.) He also reported a possible second stroke in 2005. (Id.)

Plaintiff complained to Dr. Moore primarily of problems with balance that caused him to use a cane and secondarily of "mild weakness in his left leg." (Id.) He said he had some difficulty "performing fine coordinated movements with the left fingers," felt that "his vision was getting worse," had been diagnosed with depression with psychotic features, and believed that his memory and thinking were "getting worse." (AR 420-21.) He stated that he was "afraid to drive" despite having apparently driven himself to the appointment. (AR 421.)

Dr. Moore performed a mental-status examination in which Plaintiff misstated the day of the week but was "otherwise alert and oriented to person and place." (AR 422.) He correctly identified the President, was able to calculate two plus five, and "followed three step commands and repeated two reversed digits." (Id.) His object recall was "one out of three in five minutes and two out of three with assistance." (Id.) He did not attempt to subtract seven from 100. (Id.) Dr. Moore opined that

10

Plaintiff's "general fund of knowledge appeared to be fair." (Id.)

Dr. Moore further observed that Plaintiff's speech was "normal," and he had "no difficulty in naming objects," "spoke in grammatically correct sentences," and "was able to read and write without difficulty." (Id.) Nothing indicates that an interpreter or translator was present, and the exam was apparently conducted in English. (See generally AR 420-24.)

Physical testing showed that Plaintiff had mild difficulty in fine coordinated movement with his left fingers, "a bit more than a mild left hemiataxic gait," and weakened grip strength in his left hand. (AR 422.) The exam findings were otherwise unremarkable. (See generally AR 421-23.) Dr. Moore diagnosed him with "[c]erebellar infarct with residual hemiataxia," "[h]istory of depression," and "[c]ognitive impairment possibly secondary" to the first two diagnoses. (AR 423.) He opined that Plaintiff could stand and walk "at least two hours out of an eight-hour day without an assistive device," "sit in an unrestricted manner," and "occasionally bend and stoop." (Id.) He could not "climb, balance, or work at heights" and "would have slight difficulty operating foot controls with the left leg." (Id.) He could "frequently push and pull" and "perform frequent simple gripping and frequent distal fine coordinated movements with the left hand and fingers." (Id.) "Because of his balance issues," he could "intermittently lift and carry 30 pounds and more frequently lift and carry 15 pounds." (Id.)

With respect to nonexertional limitations, Dr. Moore observed that "a component" of Plaintiff's cognitive complaints

"may be related to his left frontal infarct, but there certainly may be a component associated with an underlying depression." (Id.) He opined that Plaintiff would be "able to follow simple commands and perform simple tasks" but "would likely have slight difficulty following complex commands and performing complex tasks." (AR 423-24.) He declined to assess any more specific or restrictive nonexertional limitations on the understanding that Plaintiff would "be having psychometric tests performed for SSI purposes." (AR 423.)

b. *Psychological exams by Drs. Donohue and Campbell*

On May 25, 2013, Plaintiff met with psychologist Donohue for a consulting exam. (AR 368-74.) He presented his valid California driver's license. (AR 368; see also AR 435 (copy of Plaintiff's driver's license valid through Feb. 4, 2015).) He complained of "posttraumatic stress disorder," "mood swings," "depression," and "anger," which he attributed to the stroke or other "brain trauma" from "1995." (AR 369.) He apparently told Dr. Donohue that he was "not in current [psychiatric] treatment," had "had suicidal thoughts" in the past but was "not suicidal now" and had "never made an attempt," and "hear[d] noises and [saw] shadows of people walking." (Id.) Dr. Donohue repeatedly noted difficulty in obtaining an accurate history from Plaintiff. (See AR 368-69.)

Dr. Donohue observed that Plaintiff's motor activity was "within normal limits," further noting that "[t]here is motor slowing but some of that appears intentional." (AR 370.) His speech was "clear and fluent in English" and, although she was

12

"translating into Spanish," it was "not always helping." (Id.)
His "[i]nterview behavior showed resignation formulas and easily
giving up," and he "put[] forth a really marginal effort." (AR
371.) He reported the year and the day of the week incorrectly
and "d[id] not know" the month, date, season, name of the office,
or what county it was in. (Id.) He was not able to spell the
word "mundo" and told Dr. Donohue he could not spell "cat" in
reverse order. (Id.) He could correctly subtract seven from
100. (Id.) Dr. Donohue opined that Plaintiff's "[i]ntellect is
not able to be adequately assessed due to marginal effort."
(Id.)

Dr. Donohue attempted to administer the Trail Making Test,
parts A and B,[8] but Part A "was aborted at 15 seconds" when
Plaintiff claimed he could not go further. (AR 372.) He "was
able to pass the training item" for that test. (Id.) Dr.
Donohue also administered the Wechsler Adult Intelligence Scale —
Fourth Edition,[9] which yielded a composite IQ score of 47. (Id.)
Dr. Donohue did "not believe these scores [were] valid." (AR
373.) She attempted to administer the Wechsler Memory Scale —

---

[8]   The Trail Making Test is a timed test used to assess
cognition and screen for dementia. See Administration, Scoring
and Interpretation of the Trail Making Test, VeryWellHealth,
https://www.verywellhealth.com/dementia-screening-tool-the-trail-
making-test-98624 (last visited Sept. 28, 2018).

[9]   The Wechsler Adult Intelligence Scale — Fourth Edition
measures intelligence in adults and older adolescents. See The
Wechsler Adult Intelligence Scale, VeryWellMind, https://
www.verywellmind.com/the-wechsler-adult-intelligence-
scale-2795283 (last visited Sept. 28, 2018). It provides scores
of an examinee's verbal comprehension, perceptual reasoning,
working memory, and processing speed as well as his overall IQ
and an index of his general ability. See id.

13

Fourth Edition,[10] but the test was aborted because Plaintiff "report[ed] he [was] too confused to be able to do this and he cannot repeat back anything." (Id.)

Dr. Donohue diagnosed Plaintiff with major depressive disorder, cognitive disorder not otherwise specified "with unknown degree of impairment because of poor effort on testing," and a likely borderline to mild level of intellectual impairment. (Id.) She opined that his stroke, as "verified by CT scan," would not cause him to "fail[] preschool level items on multiple areas." (Id.) She opined that he "would be able to understand, remember, and carry out short, simplistic instructions with mild difficulty." (Id.) He "should have no difficulty to make simplistic work-related decisions without special supervision." (AR 374.) He "may have mild difficulty to comply with job rules . . . due to impulsivity with frontal lobe disorder" and "would have moderate difficulty to maintain persistence and pace in a normal workplace setting." (Id.) She noted that he "was socially inappropriate" with her in that he gave up on or refused to complete several examination items, and she was therefore "not able to assess his ability" to interact with supervisors and coworkers. (Id.) She was not able to assess his GAF score.[11]

---

[10] The Wechsler Memory Scale — Fourth Edition assesses different types of memory in adults, including auditory, visual, logical, spatial, working, immediate, and delayed. See, e.g., Sample Interpretive Report of WMS-IV Testing, Pearson Clinical, http://images.pearsonclinical.com/images/Products/WMS-IV/ WMS-IV_Writer_Report_Sofia_Estrange_September_2011.pdf (last visited Sept. 28, 2018).

[11] GAF stands for Global Assessment of Functioning and is used to rate how seriously symptoms of mental illness interfere with a person's day-to-day life. See What Is the Global

14

(AR 373.)  She further observed that Plaintiff's claimed level of memory impairment and his walking into a wall as he was leaving her office were inconsistent with his having a valid driver's license.  (AR 374.)

On August 5, 2013, the same day as his visit with Dr. Moore (to which he had evidently driven himself and at which he had presented only mild — at most — mental difficulties) (AR 420-24), Plaintiff met with psychologist Campbell for a consulting exam (AR 428-34).  He reported "difficulty processing instructions," "memory loss," "balance problems," "left-sided weakness," and "inability to express his thoughts."  (AR 429.)  He attributed those problems to a stroke in "1998."  (<u>Id.</u>)  He complained that he could not focus well enough to read or to learn his phone number or address.  (<u>Id.</u>)  He claimed that he had been "hear[ing] voices and see[ing] shadows since the stroke" but was "vague and evasive" when Dr. Campbell asked for more specific information.  (<u>Id.</u>)  He expressed worry that "people are 'doing bad things to me'" but "could not give any time in the last 15 years that this had happened."  (<u>Id.</u>)  He also reported poor appetite but had apparently gained 20 pounds in the three months before the exam.  (<u>Id.</u>)  Dr. Campbell nevertheless rated him a "fair historian."  (<u>Id.</u>)  She also rated his speech as "fluent with normal volume, rate and rhythm" and noted that his "[e]xpressive and receptive language appeared to be intact."  (AR 431.)  Plaintiff declined the services of an interpreter and apparently participated in the

Assessment of Functioning (GAF) Scale?</u>, WebMD, https:// www.webmd.com/mental-health/gaf-scale-facts (last visited Sept. 28, 2018).

exam in English without difficulty. (AR 429.)

Dr. Campbell administered the WAIS-IV and the WMS-IV tests. (AR 431-32.) She observed that Plaintiff's "manner was notable for some evidence of exaggeration and dissimulation." (AR 430.) More specifically, "[w]hen presented with even very simple tasks, he put his hands over his eyes and exclaimed, 'Oh God.'" (Id.) Plaintiff scored at or below the second percentile on both tests, indicating "extremely low" functioning. (AR 431-32.) Dr. Campbell warned, however, that the test results were "not considered to be a reliable estimation of [Plaintiff's] cognitive or intellectual functioning" because of "very poor effort." (AR 432.) She diagnosed him with "Depressive Disorder, NOS," and "Anxiety Disorder, NOS," ruled out diagnoses of "Psychotic Disorder, NOS," and "Factitious Disorder with [p]sychological [s]ymptoms," and rated his GAF score at 67, indicating "some mild symptoms" or "some difficulty in social, occupational, or school functioning" but "generally functioning pretty well," with "some meaningful interpersonal relationships." (AR 433); see also What Is the Global Assessment of Functioning (GAF) Scale?, WebMD, https://www.webmd.com/ mental-health/gaf-scale-facts (last visited Sept. 28, 2018).

Based on the exam, Dr. Campbell opined that Plaintiff "would have no impairment in understanding, remembering, and carrying out short, simple instructions." (AR 433.) His "ability to understand, remember, and carry out detailed instructions" was "mildly impaired." (AR 433.) She found Plaintiff "unimpaired in his ability to make judgments on simple, work-related decisions" but noted that he "would have moderate difficulty in relating

appropriately to the public, supervisors, and co-workers." (Id.)
She also found moderate impairment in his "ability to withstand
the stress and changes associated with an eight-hour workday and
day-to-day work activities." (Id.)  She did not assess any
limitations in maintaining concentration, persistence, or pace.
(Id.)

### c. *Medical-expert testimony*

Impartial medical expert Dr. James Haynes,[12] a neurologist
(AR 867), evaluated the longitudinal record and testified at the
December 16, 2015 hearing (see AR 875-86).  He noted that
Plaintiff had had a "stroke in the cerebellum" and "aortic valve"
replacement that had left him with vision and balance problems.
(AR 876-77.)  He opined that the medical evidence of those
physical problems supported limitations on ladders and heights
(AR 877), standing, walking, lifting, and carrying (AR 880-81);
further, "it probably [would be] reasonable [for him] to use a
walking stick of some kind." (AR 877; see also AR 882.)

With respect to Plaintiff's alleged cognitive impairments,
Dr. Haynes agreed that he had "abnormalities in the cerebellum"
(AR 877) but observed that "[t]here's a lot of psychiatric issues
here," referring to consulting examiners' descriptions of
"impaired cognition" and "question[able] effort." (AR 876.)  The
ALJ expressly asked if there might be a "neurological basis" for
Plaintiff's "severe [mental-health] complaints," "extremely low
IQ," and "major cognitive deficits with some extreme limitations"

---

[12]  Dr. Haynes's name is spelled "Haines" in the hearing
transcript (see, e.g., AR 43), but his curriculum vitae gives his
name as "James M. Haynes" (see AR 867).

as opposed to the consulting examiners' suspicions of malingering. (AR 878; see also AR 879 ("[C]ould there have been brain damage that is leading to this? Maybe he's not exaggerating . . . [maybe] [h]e's given forth his full effort.").) Dr. Haynes pointedly answered, "I don't think that it's true" and further opined that "the effort issues, I mean, worse than preschooler . . . I mean that's kind of impossible." (AR 879; see also AR 880 (Dr. Haynes testifying that Plaintiff's having "perform[ed] worse than your average preschooler" did not "make any sense" and was "not explained by neuro imaging").)

Plaintiff's counsel cross-examined Dr. Haynes but spent most of his questioning on how long Plaintiff could stand and walk. (See AR 882-83.) In his single question related to his client's alleged cognitive impairments, he asked Dr. Haynes whether he had seen "any notations about [Plaintiff's] exaggerating?" (AR 884.) Haynes replied, "[n]ot exactly" but observed that his "depression [was] probably pretty significant" and could cause "pseudo dementia." (Id.) Plaintiff's counsel did not follow up on that statement and had no further questions for the doctor. (Id.; see also AR 885.)

### 3. Analysis

The ALJ found no severe mental impairment at step two and included no mental limitations in Plaintiff's RFC. (See AR 23-24.) Plaintiff argues that the ALJ's failure to give specific reasons for "ignor[ing]" the mild to moderate cognitive limitations opined by Drs. Donohue and Campbell amounts to reversible error. (See J. Stip. at 5.) He is incorrect, for the reasons set forth below.

1

           a.  *The ALJ did not err in finding Plaintiff's*

2                *mental-health impairments not severe at step*

3                *two*

4        At step two, the ALJ found that Plaintiff's "medically

5   determinable impairments of depressive disorder and anxiety

6   disorder," considered alone or together, did not "cause more than

7   minimal limitation" on his "ability to perform basic mental work

8   activities."  (AR 23.)  He thus classified them as "nonsevere."

9   (Id.)  The ALJ gave "great weight" to Drs. Donohue's and

10  Campbell's opinions that Plaintiff "gave poor effort, the testing

11  was invalid, and [his] symptoms were disproportionate to the

12  objective findings."  (AR 30.)  Despite Plaintiff's apparent

13  belief to the contrary (see J. Stip. at 11-12), he did not give

14  great weight to any of the functional limitations opined by

15  either doctor (see AR 30; see also generally AR 27-31).  Indeed,

16  the paragraphs affording "great weight" to the portions of their

17  opinions bearing on Plaintiff's credibility (AR 30) make that

18  clear by observing that his symptoms were "disproportionate to

19  the objective findings" in a way that "would not be expected

20  following [his] stroke" and that he gave "vague and evasive

21  answers" and engaged in "exaggeration and dissimulation" when

22  examined by Dr. Campbell (id.).  An ALJ may properly find that a

23  plaintiff's repeated failure to give full effort during an exam

24  undermines the alleged limiting effect of his symptoms.  See

25  Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).

26       Moreover, the ALJ provided ample support elsewhere in his

27  decision for implicitly rejecting the mental restrictions found

28  by Drs. Campbell and Donohue.  (See generally AR 28-31.)

                                19

Although the decision falls just short of an explicit statement of his reasoning, reviewing courts "are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion." Magallanes, 881 F.2d at 755 (ALJ not required to recite "incantation" such as "I reject [this doctor's] opinion about [this issue] because . . . ."). He cited Dr. Campbell's opinion for the proposition that "the alleged limiting effects of [Plaintiff's] symptoms are questionable." (See AR 30.) He later stated, "I find [Plaintiff] and his partner, Roger Kincaid, not credible" (id.), a determination that Plaintiff has not disputed (see J. Stip. at 4-13, 19-20). He then cited Dr. Haynes's testimony that Plaintiff's stroke did not support "the alleged limiting effects of [his] complaints, mental and otherwise" (AR 31) — testimony that Plaintiff's hearing counsel made no serious effort to undermine (see AR 884) — and found that Plaintiff's treating providers' "belief that [he] is not a malingerer" was "inconsistent with the evidence of record" (AR 31).

Plaintiff has not disputed those findings, either. (See J. Stip. at 4-13, 19-20.) His argument amounts to a request for an "incantation" of "magic words" when none is required. See Magallanes, 881 F.2d at 755; see also Gray v. Comm'r of Soc. Sec. Admin., 365 F. App'x 60, 62 (9th Cir. 2010) (ALJ did not err in declining to include plaintiff's claimed level of cognitive limitation in RFC when doctors reported she gave poor effort on IQ testing and he found her testimony not fully credible); Deleon v. Astrue, No. 09cv2282-WQH (Wmc)., 2010 WL 3418425, at *5 (S.D. Cal. July 30, 2010) (plaintiff's counsel's having chosen to present "few or no questions" to medical expert on impairments at

issue on appeal weighed against finding of error), accepted by 2010 WL 3418423 (S.D. Cal. Aug. 26, 2010). It is therefore without merit.

The ALJ's finding that Plaintiff's mental impairments were not severe was thus supported by substantial evidence in the record and free of the legal errors alleged by Plaintiff. Webb, 433 F.3d at 687.

> b. *Any error in finding Plaintiff's cognitive impairments not severe would have been harmless*

As noted above, the step-two inquiry is "a de minimis screening device to dispose of groundless claims" when a claimant's impairments are not severe. Smolen, 80 F.3d at 1290. When a claimant is found to have any severe impairment, the ALJ is required to consider the functional effect of all his impairments, both severe and nonsevere. See SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"); see also Gray, 365 F. App'x at 61 (no reversible error in ALJ's step-two determination that certain impairments were nonsevere when ALJ found other severe impairments and considered but discredited nonsevere impairments at step five). In such circumstances, any step-two error is harmless. See Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (as amended) (any step-two error would be rendered harmless by ALJ's consideration of nonsevere impairments at step four); Bickell v. Astrue, 343 F. App'x 275, 278 (9th Cir. 2009) (same).

The ALJ found Plaintiff to have other severe impairments (see AR 23) and expressly considered the "entire record" in assessing his RFC (AR 24), including evidence of his mental health provided not only by Drs. Donohue and Campbell but also Dr. Moore and psychiatrists Khushro Unwalla and Han Nguyen, among others (AR 26-29). He found at step two that Plaintiff had "mild limitation" in the area of "concentration, persistence[, and] pace" (AR 24), a finding that was apparently based in part on the opinions of Drs. Donohue and Campbell (see AR 27-29 (citing medical evidence from Drs. Han Nguyen, Matthew MacKay, Imelda Alfonso, Jon Porter, Donohue, Campbell, and Unwalla)).[13]

Thus, the ALJ's determination as to the severity of Plaintiff's mental condition had no effect on his obligation to review and consider all evidence of record, which he did.[14] (See AR 24, 31 ("[a]lthough [Plaintiff's] alleged symptoms and limitations are not entirely supported by the objective medical evidence, I have considered them").) Accordingly, even had the

[13] Dr. Donohue assessed a "moderate" limitation in maintaining "persistence and pace in a normal workplace setting" but otherwise assessed no more than mild impairments. (AR 373-74.) Dr. Campbell assessed moderate limits in "relating appropriately to the public, supervisors, and coworkers" and in withstanding "the stress and changes associated with an eight-hour workday and day-to-day work activities." (AR 433.) She otherwise found Plaintiff to have no more than mild limitations. (AR 433.)

[14] Plaintiff does not argue that the ALJ erred at step two by failing to give sufficient weight to any of the other medical opinions in the record, some of which support greater restrictions than do those of Drs. Campbell and Donohue. (See J. Stip. at 5 n.2 (citing AR 88-94, 114-16, 368-76, 428-37, 508-14, 522-27).) To the contrary, Plaintiff has stipulated that "the ALJ fairly and accurately summarized the medical and non-medical evidence of record" except as to Drs. Donohue and Campbell. (See id. at 4.)

ALJ erred at step two, any such error would have been harmless.

Plaintiff also contends that the ALJ erred by omitting the mental limitations opined by Drs. Campbell and Donohue from his RFC. (See J. Stip. at 10.) As discussed above, the ALJ did not err in rejecting any mental limitations, but even if he had it would not have provided grounds for reversal. At the hearing, the VE testified that a hypothetical individual with Plaintiff's physical limitations[15] who was limited to "non-public, simple, repetitive tasks with non-intense and superficial interaction with others" could perform three unskilled sedentary jobs existing in significant numbers in the national economy: addresser (DOT 209.587-010, 1991 WL 671797 (Jan. 1, 2016)), assembler (DOT 726.684-034, 1991 WL 679599 (Jan. 1, 2016)), and document preparer (DOT 249.587-018, 1991 WL 672349 (Jan. 1, 2016)). (AR 59-60.)

Plaintiff argues that an RFC consistent with the hypothetical that limited him to "simple repetitive tasks" without significant interaction with others would not "adequately

_____

[15] The physical limitations in the hypothetical are actually more restrictive than those ultimately contained in Plaintiff's RFC. (Compare AR 59-60 (hypothetical individual able to "lift and/or carry 20 pounds occasionally and 10 pounds frequently," "stand and/or walk for four-hours in an eight-hour period with the use of a single pointed cane," "frequently perform simple gripping and frequently perform distal fine coordinating movements with the left . . . hand and fingers," occasionally "balance," "walk over uneven terrain," and "operate foot controls with the left foot" but never "work at heights," "climb ladders, ropes, or scaffolds" or do "work requiring excellent visual acuity"), with AR 24 (RFC finding that Plaintiff "does not require a cane in order to stand or ambulate" and could "occasionally climb" but never "climb ladders, ropes, or scaffolds, or work at unprotected heights"; no restrictions on visual acuity or use of left hand or fingers).)

23

address the limitations identified by Drs. Donohue and Campbell."
(J. Stip. at 12 n.3.)  He cites several cases in support of the
proposition that impairment in "concentration, persistence, or
pace" or "interaction with coworkers" is insufficiently addressed
by an RFC assessing limitations to simple, repetitive tasks or
unskilled work.  (See id.)  But — crucially — in each of those
cases the ALJ found the plaintiff's mental impairments fully
credible.  See Bagby v. Comm'r of Soc. Sec., 606 F. App'x 888,
890 (9th Cir. 2015) (citation omitted) (remanding because RFC
"failed to include all of [plaintiff's] credible limitations");
Brink v. Comm'r Soc. Sec. Admin, 343 F. App'x 211, 212 (9th Cir.
2009) (reversal warranted when ALJ "accepted medical evidence
that [plaintiff] ha[d] moderate difficulty maintaining
concentration, persistence, or pace" but hypothetical to VE
included only limitation to "simple, repetitive work"); Juarez v.
Colvin, No. CV 13-2506 RNB., 2014 WL 1155408, at *7 (C.D. Cal.
Mar. 20, 2014) (restriction to "simple tasks" did not adequately
reflect ALJ's "express[]" finding, "consistent with the opinion
of a state agency review physician," that plaintiff had "moderate
limitation in maintaining concentration, persistence, and pace").

Unlike in those cases, the ALJ did not find the degree of
Plaintiff's alleged cognitive impairments fully credible, a
finding that — as discussed above — was supported by substantial
evidence, including Drs. Donohue's and Campbell's own findings.
(See AR 373 (Dr. Donohue cautioning that "[Plaintiff] is showing
significant symptoms for an excess of what would be expected"
with his medical history), 432 (Dr. Campbell stating, "[t]his
test result is not considered to be a reliable estimation of

[Plaintiff's] cognitive or psychological functioning").)

The Ninth Circuit has made clear that an ALJ's assessment limiting the plaintiff to simple tasks "adequately captures restrictions related to concentration, persistence, or pace" when it is "consistent with the restrictions identified in the medical testimony." Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008). This is so even when the restrictions are "moderate" rather than mild. See id. at 1173-74 ("moderate" mental limitations adequately captured by restriction to "simple," "repetitive," "routine" work); see also McGarrah v. Colvin, 650 F. App'x 480, 481 (9th Cir. 2016) ("[Plaintiff's] RFC to perform simple tasks adequately captured her moderate limitations"; finding that unskilled jobs listed in DOT met this standard).

The hypothetical posed to the VE met the applicable standard. (See AR 59-60.) The three jobs listed are all "unskilled," meaning that they "need[] little or no judgment to do simple duties that can be learned on the job in a short period of time." See § 416.968(a). Their descriptions in the DOT do not mention interaction with the public, and none require significant social skills of any kind. See DOT 209.587-010, 1991 WL 671797 ("Addresser"; "[p]eople" skills rated "[n]ot [s]ignificant"); DOT 726.684-034, 1991 WL 679599 ("Assembler, [s]emiconductor"; same); DOT 249.587-018, 1991 WL 672349 ("Document [p]reparer, [m]icrofilming"; same). Even if the ALJ had fully credited the moderate limitations opined by Drs. Donohue and Dr. Campbell — which he did not — and incorporated them into Plaintiff's RFC, he still would have found him able to perform the jobs identified in the VE's testimony, thereby

precluding a finding of disability.  (See AR 60.)  Any error on this ground would therefore have been harmless.  See Molina, 674 F.3d at 1111, 1115.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[16] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and GRANTING judgment in Defendant's favor.


DATED: October 1, 2018

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[16] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."